**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| John Trenton Pendarvis, ) | C/A No: 2:22-CV-03142-BHH-MHC |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **AMENDED** |
| Alan M. Wilson, Mark A. Keel, Hugh E. ) | **COMPLAINT** |
| Weathers, L.C. Knight, W. Jeffrey Young, ) | **(42 U.S.C. § 1983 *et seq.*)** |
| Robert D. Cook, Emory Smith, Jr., David S. ) | **(Jury Trial Demanded)** |
| Jones, T. Stephen Lynch, Harley L. Kirkland, ) | |
| Wesley Vorberger, Robert Kittle, Adam L. ) | |
| Whitsett, Frank O'Neal, Jason Wells, Glenn ) | |
| Wood, John Neale, Rhett Holden, Alden G. ) | |
| Terry, Derek M. Underwood, J. Clint Leach, ) | |
| Aaron Wood, John Stokes, Vanessa Elsalah, ) | |
| Brittany Jeffcoat, Eva Moore, Ray Dixson, ) | |
| Frank Thompson, Robert Krutak, Jonathan ) | |
| Calore, Charlie Scrubbs, and Wayne Eaddy, ) | |
| ) | |
| Defendants. ) | |

The Plaintiff, by and through his undersigned attorneys and complaining of the Defendants herein, hereby alleges and pleads the following:

**PRELIMINARY STATEMENT OF CASE, PARTIES & JURISDICTION**

1. Plaintiff John Trenton Pendarvis (Pendarvis) is a citizen and resident of, and the majority of events giving rise to this litigation took place in, Dorchester County, South Carolina, within the Charleston Division of the District of South Carolina.

2. Pendarvis alleges violations of his constitutional rights by the Defendants in their individual capacities pursuant 42 U.S.C. §§1983 *et seq.*, for the Defendants' conduct individually and in concert with others, under color of state law in falsely arresting Pendarvis, maliciously prosecuting him, unlawful taking and destruction of his property, depriving him of due process,

conspiring to do the same, then further conspiring to obstruct justice and deny Pendarvis due process through intentional and willful discovery abuse in state court actions.

3.  At all times relevant to this action, all Defendants were acting under the color of state law as agents, employees and/or heads of state governmental agencies. These Defendants are being sued for their own individual and personal conduct, their conduct in concert and/or conspiring with others and, for those with supervisory capacity, their supervisory conduct over subordinate Defendants.

4.  Plaintiff is informed and believes that Alan M. Wilson (WILSON), W. Jeffery Young (YOUNG), Robert D. Cook (COOK), Emory Smith Jr. (SMITH), T. Stephen Lynch (LYNCH), Robert Kittle (KITTLE), David S. Jones (JONES), Harvey K. Kirkland (KIRKLAND), and Wesley Vorberger (VORBERGER), collectively referred to as "SCAG Defendants," are being sued in their individual capacities under 42 U.S.C. §§1983, *et seq*, for their conduct under the color of state law as the head of, supervisory agent/employees and/or agents/employees for SCAG and their efforts to act independently and/or conspire with others to violate the Plaintiff's constitutional rights and/or to cover-up the constitutional violations against the Plaintiff.

5.  Plaintiff is informed and believes that Mark A. Keel (KEEL), Adam L. Whitsett (WHITSETT), Frank O'Neal (ONEAL), Jason Wells (WELLS), Glenn Wood (GWOOD), John Neale (NEALE), and Rhett Holden (HOLDEN) , collectively referred to as "SLED Defendants" are being sued in their individual capacities under 42 U.S.C. §§1983, *et seq*, for their conduct under the color of state law as the head of, supervisory agent/employees and/or agents/employees for SLED and their efforts to act independently and/or conspire with others to violate the

Plaintiff's constitutional rights and/or to cover-up the constitutional violations against the Plaintiff.

6. Plaintiff is informed and believes that Hugh E. Weathers (WEATHERS), Alden G. Terry (TERRY), Derek M. Underwood (UNDERWOOD), J. Clint Leach (LEACH), Aaron Wood (AWOOD), John Stokes (STOKES), Vanessah Elsalah (ELSALAH), Brittany Jeffcoat (JEFFCOAT), and Eva Moore (MOORE), collectively referred to as "DAG Defendants," are being sued in their individual capacities under 42 U.S.C. §§1983, *et seq*, for their conduct under the color of state law as the head of, supervisory agent/employees and/or agents/employees for DAG and their efforts to act independently and/or conspire with others to violate the Plaintiff's constitutional rights and/or to cover-up the constitutional violations against the Plaintiff.

7. Plaintiff is informed and believes that L.C. Knight (KNIGHT), Ray Dixson (DIXSON), Frank Thompson (THOMPSON), and Robert Krutak (KRUTAK), collectively referred to as "DCSO Defendants," are being sued in their individual capacities under 42 U.S.C. §§1983, *et seq*, for their conduct under the color of state law as the head of, supervisory agent/employees and/or agents/employees for DCSO and their efforts to act independently and/or conspire with others to violate the Plaintiff's constitutional rights and/or to cover-up the constitutional violations against the Plaintiff.

8. Plaintiff is informed and believes that Jonathan Calore (CALORE), Charlie Scrubbs (SCRUBBS) and Wayne Eaddy (EADDY), collectively referred to as "FORESTRY Defendants," are being sued in their individual capacities under 42 U.S.C. §§1983, *et seq*, for their conduct under the color of state law as the head of, supervisory agent/employees and/or agents/employees for FORESTRY and their efforts to act independently and/or conspire with

others to violate the Plaintiff's constitutional rights and/or to cover-up the constitutional violations against the Plaintiff.

9.  Subject matter jurisdiction is conferred upon the Court by 28 U.S.C.A. §§ 1331, 1367 and 1343.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), (2) & (3).

### NATURE OF ACTION

11. Plaintiff's claims are brought pursuant to 42 U.S.C.A. §§1983, *et seq*., and the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and under the common law, the statutory law, and the Constitution of the State of South Carolina, against the Defendants. The Plaintiff's claims would specifically include, but not be limited to, claims under 42 U.S.C. §1983 *et seq*.

12. During the time in question, the Plaintiff's Constitutional rights were well established and well known to the Defendants, including and not limited to, the Plaintiff's right to bodily integrity, right to be free from unreasonable searches and seizures, right to Due Process, and all other constitutional established and recognized as arising from the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

13. During the time in question, the Defendants had actual and/or constructive knowledge that their conduct posed an unreasonable risk of Constitutional injury to the Plaintiff and their responses with that knowledge were subjectively and objectively unreasonable regarding the offense(s) as alleged herein; and there is a causal link between their actions and the Constitutional injuries suffered by the Plaintiff.

### FACTUAL ALLEGATIONS
**The Hemp Farming Act and legalization in South Carolina**

14. South Carolina's Hemp Farming Act (HFA), 2014 Act No.216, was signed into law on March 28, 2019, and is contained within S.C. Code §46-55-10 *et seq.*

15. In passing the HFA, the South Carolina General Assembly provided statutory safeguards to protect South Carolina farmers, codifying these safeguards via S.C. Code §46-55-40, Corrective Action Plans, which provides that South Carolina farmers "shall" be allowed "to conduct a corrective action plan if the commissioner, or his designee, determines that the licensee negligently violated" the HFA.

16. Included in S.C. Code §46-55-40 are the following specific examples of violations for which a South Carolina farmer licensed under the HFA shall be allowed to conduct a corrective action plan:

   a.  Failing to provide a legal description and global positioning coordinates of the land on which the licensee cultivates hemp;

   b.  Failing to obtain a proper license or other required authorization from the commissioner; or,

   c.  Producing Cannabis sativa L with more than the federally defined THC level for hemp.

*See* S.C. Code §46-55-40(A)(1)(a)(b)and(c).

17. The South Carolina General Assembly further safeguarded South Carolina farmers by specifically directing that the corrective plans described in S.C. Code §46-55-40 were "**the sole remedy for negligent violations of this chapter**, regulations promulgated pursuant to this chapter, or the state plan. A licensee who violates a provision of this chapter, regulations promulgated pursuant to this chapter, or the state plan **shall not be subject to any criminal or civil enforcement action**." S.C. Code §46-55-40(A)(3), emphasis added.

18. The SC General Assembly directed WEATHERS and DAG to submit a "state plan" to the United States Department of Agriculture (USDA) within sixty (60) days of the effective date

5

of the Act that proposed to regulate hemp production and was required to include "a procedure to comply with the enforcement outlined in this act." *See* 2019 Act No.14, Section 2(A)(4).

19. WEATHERS, TERRY, UNDERWOOD, LEACH, AWOOD, STOKES, ELSALAH, JEFFOCOAT and MOORE failed to timely submit a "state plan" as required by the Act, with no "state plan" being submitted, let alone approved, until (according to a press release by MOORE on behalf of DAG), April 2, 2020.

20. Both WILSON and KEEL and their agents/employees and agencies have been vehemently and publicly opposed to cannabis legalization efforts in South Carolina. This opposition is exemplified by a joint press conference featuring WILSON and KEEL in January 2019 at which WILSON referred to cannabis as "the most dangerous drug" and by KEEL having his agents/employees like ONEAL regularly speak to civic, community and law enforcement groups in opposition to the legalization of cannabis in any form or fashion.

### The Plaintiff and the Hemp Farming Program

21. Subsequent to the passage of the Act and its signing into law, the DAG Defendants actively promoted their Hemp Farming Program, with WEATHERS, TERRY, ENSALAH and MOORE all actively promoting hemp farming through public statements and speaking engagements in the community.

22. Pendarvis bought in to the DAG Defendants' promotion of hemp as a potential cash crop and applied to participate in the DAG Defendants hemp farming program, paying a $500 Dollar application fee and being issued License #1992 on or about May 1, 2019, a license that authorized Pendarvis to grow and cultivate hemp.

23. To obtain the license described above, Pendarvis was required to enter in to a "Hemp Farming Program Participation Agreement" (HPA), as any South Carolina farmer wishing to grow hemp had to enter in to the HPA in order to be issued a hemp grower license.

24. Section VIII of the HPA, titled "Plant Destruction," stated:

    a. Permitted Grower acknowledges and consents to the forfeiture or destruction, without compensation, of hemp material:

        i. Found to have a measured delta-9 THC content of more than 0.3 percent on a dry weight basis;

        ii. Bearing off-label pesticide resideues (or believed by [DAG] to have had pesticides applied off-label), regardless of the source or cause of contamination; and

        iii. Growing in an area that is not licensed by [DAG].

    b. Notwithstanding the foregoing, Permitted Grower or processors may retain any hemp that tests between three-tenths of one percent to one percent delta-9 tetrahydrocannabinol on a dry weight basis and recondition the hemp product by grinding it with the stem and stalk. Hemp product must not exceed three-tenths of one percent delta-9 tetrahydrocannabinol.

25. The language of Section VIII quoted verbatim above is directly contradicted by the plain language of the statute, which specifically directs that for two of the three listed conditions for destruction under VIII(a), the corrective action plans as required under S.C. Code §46-55-40 **are the sole remedy** for negligent violations.

26. There is no language in the Agreement outlining the procedure by which DAG will enact enforcement, as was required in the HFA. *See* 2019 Act No.14, Sec.2(A)(4). Specifically, despite the WEATHERS having sworn a duty to uphold and protect the Constitution of the United States and the State of South Carolina, nowhere in the Agreement is there any language explaining how a finding by DAG that a violation of the HFA has occurred, or a finding of whether the alleged violation is negligent or willful, can be challenged, despite South

Carolina's Constitution specifically guaranteeing 4th, 5th and 8th Amendment rights to due process right apply to such agency decisions:

> No person shall be finally bound by a judicial or quasi-judicial decision of an administrative agency affecting private rights **except on due notice and an opportunity to be heard**; **nor shall he be subject to the same person for both prosecution and adjudication**; nor shall he be deprived of liberty or property unless by a mode of procedure described by the General Assembly, and **he shall have in all such instances the right to judicial review**.

South Carolina Constitution, Art. I, Sec.22, emphasis added.

27. Pendarvis is informed and believes that throughout the enforcement action taken against him by the Defendants as detailed in this complaint, all of the Defendants were aware that: a) Pendarvis had these constitutional rights, and b) that at no time had Pendarvis ever waived such rights.

**Allegations of Plaintiff Violating Hemp Agreement**

28. After receiving his license, Pendarvis was confronted with drought conditions so severe that WEATHERS publicly warned on October 31, 2019 "we may be seeing its effects for a long time."

29. Those drought conditions led to Pendarvis being unable to plant his hemp crop on the GPS coordinates he had originally designated to DAG.

30. On July 30, 2019, while ELSALAH conducted a farm visit at Pendarvis' Dorchester County property it was discovered that Pendarvis' had planted his Dorchester County crop on coordinates other than those that had been submitted to DAG. Pendarvis is informed and believes he sent the correct coordinates via a text message during or immediately following ELSALAH's visit.

31. On July 31, 2019, at 2:52 p.m., UNDERWOOD sent Pendarvis an email, courtesy copying TERRY, asking Pendarvis to "provide a narrative of your reasoning for not sending in an amendment and planting hemp on 10 acres of non-amended farm land."

32. Pendarvis replied with an email that same afternoon explaining that weather/soil conditions had prohibited him from using the GPS coordinates originally reported, he had not realized the fields used were not on file (believing he had reported multiple fields) and that he had believed "everything would be finalized during inspection." Pendarvis pointed out the additional field was within a two-mile radius of the original reported field and that it had not increased acreage. That same day, UNDERWOOD spoke with Pendarvis on the phone and told Pendarvis that he would need to submit an official amendment form for review, which Pendarvis did the next day.

33. Via email dated that same Thursday, August 1, 2019, at 11:58 a.m., and which was courtesy copied to ELSALAH and TERRY, UNDERWOOD told Pendarvis his case would be reviewed "with our Attorney to determine if a willful violation of the grower's agreement is present" and **"once we make a final decision, we will be in touch**."

34. Four days later on August 5, 2019 UNDERWOOD sent an email to WELLS, courtesy copying ELSALAH, TERRY and ONEAL, in which he reported to SLED that DAG had found Pendarvis "has willfully grown hemp on non-reported or non-listed acreage for 6-8 weeks."

35. That first August 5th email was immediately followed by another email from UNDERWOOD, sent to WELLS and ONEAL, courtesy copied to TERRY and ELSALAH, with the subject heading "Memo to Enact Enforcement," importance labeled "high," and containing the attachment "Memo to SLED 8-5-2019 Pendarvis.pdf" which informed SLED that DAG had

decided Pendarvis' growing location issue was a "willful violation of the Hemp Farming Act" and "request SLED enact enforcement of this violation."

36. On August 6, 2019, UNDERWOOD sent an email to WELLS and courtesy copied to ONEAL, TERRY and WEATHERS, attaching an edited version of the memo which had new language stating that "[DAG] does not believe this violation to be negligent or an oversight on the part of Mr. Pendarvis."

37. On August 8, 2019, 11:48 a.m. UNDERWOOD sent an email to WELLS, courtesy copying ONEAL, TERRY, WEATHERS and ELSALAH, wherein DAG was asking SLED "Any update?" regarding the "Letter to enact enforcement Pendarvis Hemp."

38. ONEAL responded to UNDERWOOD, TERRY, WEATHERS, ELSALAH, and WELLS, replying that "we are having difficulty in what to address **with so many gray areas concerning enforcement**…We are having to get AG opinions along the way and **the last thing we want to do is an action that will be perceived in a negative light by the media or general assembly**."

39. At no time above did UNDERWOOD, TERRY, WEATHERS or ELSALAH, inform ONEAL, WELLS or any other Defendant the reason there were "so many gray areas" in enforcement was because the DAG Defendants had failed to create and/or submit a state plan to the USDA within sixty days (which would have been May 27, 2019), as required by the HFA.

40. UNDERWOOD replied to that email letting ONEAL, WELLS, TERRY, WEATHERS and ELSALAH all know DAG would not approve Pendarvis' amendment application so there was no "deadline" to act and for SLED to let DAG know "what we need to do to help" in the enforcement actions being taken against Pendarvis.

**August 8, 2019 SCAG Opinion**

41. The SCAG opinion ONEAL's August 8th email referenced, was requested on behalf of the SLED Defendants by WHITSETT via an August 6, 2019, email to JONES, seeking **"specific guidance…on the proper procedure in this matter":**

42. WHITSETT's email was forwarded by JONES to COOK the morning of August 7, 2019, with COOK promptly replying about how the HFA is an "ultra murky" statute, that gives "no direction whatever to law enforcement."

43. JONES and COOK traded emails with draft language, noting at one point that "**if we want to talk about due process, there it is**," before forwarding a final draft to SCAG admin staff directing the opinion be tagged as "Constitutional law" with the description "**An opinion on the appropriate procedure to pursue enforcement of the Hemp Farming Act with respect to hemp grown in violation of the Act**."

44. The final opinion signed by JONES and COOK on behalf of SCAG dated August 8, 2019 (August 8th Op.) was addressed to WHITSETT and specifically provided the "specific guidance" WHITSETT had requested "on the proper procedure" when enforcing a "willful violation" included that "SLED should seek judicial authorization for illegally-grown hemp in order to ensure that the grower receives due process," that authorization be sought "with notice to the grower and an opportunity for them to be heard in a hearing in an abundance of caution."

45. The August 8th Op. concluded by pointing out the DAG Defendants need to promulgate regulations to address some of the "numerous issues" that had been raised by SLED and SCAG regarding their perceived shortcomings with the HFA as drafted by the SC Legislature, but failed to mention the state plan or the 4th, 5th and 8th amendment due process protections required by Art. I, Sec.22 of the South Carolina Constitution.

46. The regulations suggested by JONES and COOK should have been covered within the "state plan" WEATHERS and the DAG Defendants were required to promulgate and submit to the USDA within sixty (60) days of the HFA's effective date, which WEATHERS and the DAG Defendants failed to do. This is evidenced by the "state plan" which was ultimately submitted and approved **after** the actions taken by the Defendants to arrest and destroy Pendarvis' hemp crop containing an entire section on "Enforcement," detailing "Adjudicatory Proceedings" in which "the Commissioner shall notify the Permittee of the alleged violation as well as an opportunity to respond therein, by certified mail, prior to any scheduled hearing date" (*see* State Plan, Sec.17(1(b)); "no penalty shall be assessed, nor may any permit be suspended or revoked by the Commissioner prior to the holding on an adjudicatory hearing" (Sec.17(1(d)); requiring the adjudicatory hearing to be conducted pursuant to the S.C. Administrative Procedures Act (Sec.17(1(e)); and providing an appeals process (Sec.17(2)).

**Pre-litigation Known Conduct After the August 8ᵗʰ Op.  leading to Arrest & Destruction**

47. On August 28, 2019, while NEALE was at Pendarvis' farm collecting samples, Pendarvis informed NEALE there were two additional acres he had used for his allotment in Marion Co., subsequently emailing to DAG a 2ⁿᵈ Acreage Amendment Application at approximately 10:38 a.m. ("Marion Co. crop"), providing both a street address and GPS coordinates.

48. On Thursday August 29, 2019, at 11:53 a.m., UNDERWOOD sent Pendarvis an email, courtesy copied to ELSALAH and TERRY, which informed Pendarvis it was the "official response" to his actions and that DAG was not processing his location amendment applications because DAG believed it was a willful violation. Despite stating DAG had notified SLED of "these culpable violations, greater than negligence," the correspondence did not explain to Pendarvis SLED had been notified 24 days prior, what rights/procedure Pendarvis had to

challenge DAG's decision, and/or what enforcement action was being pursued against Pendarvis.

49. Pendarvis called UNDERWOOD "several times" over the weekend following that Thursday, August 29, 2019, email, but UNDERWOOD "waited until first of the week to return his call." UNDERWOOD describes Pendarvis asking "what does this letter mean," and that Pendarvis "seemed confused and asked what he needed to do." UNDERWOOD offered no explanation beyond the letter and an instruction that Pendarvis could contact TERRY.

50. On September 6, 2019, JEFFCOAT began emailing Pendarvis asking him about "the two additional acres you wish to amend to your license," i.e., the Marion Co. crop.

51. On September 10, 2019, UNDERWOOD joined the effort, emailing Pendarvis, JEFFCOAT, ELSALAH and TERRY at 4:52 p.m., telling Pendarvis his "cooperation in this matter is of upmost importance" and "time is of the essence" regarding the Marion Co. crop, with JEFFCOAT following up with another email courtesy copying UNDERWOOD, ELSALAH and TERRY again requesting Pendarvis provide the location of the additional two acres.

52. The next day, September 11, 2019, TERRY emails Pendarvis, courtesy copying UNDERWOOD, JEFFCOAT and ELSALAH and specifically stating DAG is being asked to obtain the location information by SLED.

53. Pendarvis responded via email dated September 11, 2019, 8:12 a.m., by email resubmitting the 2nd Acreage Amendment Application, noting it was the same application "**sent on August 28th for Trent Pendarvis**" and explaining to call if anything else was needed.

54. Sometime before 11:45 a.m. on September 19, 2019, NEALE obtained Arrest Warrant 2019A1810300867 for a "Miscellaneous/General Sessions Misdemeanor Offense where no punishment provided by statute" from Dorchester County Magistrate Judge Ryan D.

Templeton.  The warrant was prepared by NEALE with assistance/review from GWOOD. The affidavit portion of that warrant referenced an "attached affidavit." That affidavit was executed by NEALE and describes the offense as "Unlawful Cultivation of Hemp – 1st Offense (CDR CODE 3554) CODE SECTION: 46-55-20(A)(1)" and contains "probable cause" sworn testimony by NEALE that states DAG determined Pendarvis willfully violated the HFA because he grew hemp on "the Maple Hill Road site" without obtaining prior approval and his amendment application was denied.

55. Notably absent from the warrant or affidavit is any notice that the SLED Defendants were going to seize and destroy Pendarvis' hemp crop upon serving the requested arrest warrant **or** that the SLED Defendants had previously attempted to obtain judicial authorization for seizure and destruction and that judicial authorization had been denied. WHITSETT has verified under oath such information was **not** relayed to Magistrate Judge Templeton.

### Arrest & Destruction of Dorchester County Hemp Crop

56. On September 19, 2019, at approximately 11:45 a.m., numerous Defendants showed up at Pendarvis' farm in Dorchester County. Pendarvis is informed and believes that specific individual Defendants present at his Dorchester County farm that day were ONEAL, NEALE, GWOOD, HOLDEN, STOKES, DIXSON, THOMPSON, KRUTAK, SCRUBBS and EADDY, but he believes there may have been other individuals also present. At least one Defendant, THOMPSON, was outfitted as though they were serving a high-risk warrant on a violent criminal, dressed in a tactical vest sporting multiple loaded 30-round high-capacity assault rifle magazines.

57. Interactions between Pendarvis and some of the Defendants at his Dorchester County farm on September 19, 2019, are memorialized via a body-worn camera (BWC) video that has been identified by SLED as being GWOOD's BWC.

58. That video shows a SLED Agent (believed to be NEALE), ONEAL and GWOOD (not visible, but present via audio since it is his BWC) having the following exchange with Pendarvis beginning at the 11:49:00 timestamp and showing Pendarvis **refusing to consent to the destruction of his hemp crop** and instead requesting due process (to call his lawyer):

-NEALE:         We have got to something with this. So are you good with us, cutting it down or…

-PENDARVIS:   I'd rather you talk to my lawyer first.

-NEALE:         Ok.

-ONEAL:         Who's your lawyer?

-PENDARVIS:   I'll get ahold of Mr. Charles Williams.

-ONEAL:         Ok. (*looking at NEALE and nodding*) **Go ahead then**.

-NEALE:         Well, right now (*walking over to Pendarvis and grabbing his arm*) we are going to place you under arrest for growing hemp without a license.

-ONEAL:         Cultivating.

-PENDARVIS:   For what?

-NEALE:         Because this is not – this is an unlawful –

-ONEAL:         We'll serve the warrant here in just a minute. Tell you about – what's all involved.

59. At 11:50:21, as NEALE and ONEAL are cuffing his hands behind his back, Pendarvis asks for due process a second time:

-PENDARVIS:   Can I call my lawyer before y'all –

-GWOOD:  **Yes, sir**. **Absolutely**. Let them finish getting your knives and stuff. Then they'll take those cuffs lose for a second and **we'll let you make that telephone call**.

(*ONEAL approaches GWOOD and motions for him to follow*)

-ONEAL:  Hey, let me talk to you for a second.

60. ONEAL and GWOOD walk away from Pendarvis and GWOOD's BWC mic is turned off, after which there are no more assurances that Pendarvis will be allowed a call while on the scene. STOKES is standing in proximity to ONEAL and GWOOD when the "unrecorded" conversation takes place, after which no more assurances of phone calls on site are made.

61. Plaintiff is informed and believes that ONEAL and GWOOD intentionally cut off GWOOD's BWC mic so as to willfully and intentionally fail to preserve video evidence, conduct which violates SLED Policy 13.43 "Body Worn Cameras." Specifically, "Operating Procedures," subsection (3), which states "during these types of encounters, once the BWC is activated it **should remain on until the incident has reached a conclusion or the agent leaves the scene**"; subsection (11) which details the requirements of stopping a BWC recording if it becomes necessary; or subsection (14) prohibiting agents from attempting "to edit or erase any BWC recordings without express permission from the Chief."

62. All told, Pendarvis requested due process **before** his hemp crop was destroyed at least seven (7) times, with the BWC videos showing these requests for being made in full view and hearing of ONEAL, NEALE, GWOOD, STOKES, and THOMPSON. Those requests by Pendarvis included specific requests to contact his lawyer **before** his hemp crop was destroyed with Pendarvis specifically being told by ONEAL, in full view and hearing of the other on-scene defendants, that "we're gonna cut it regardless. Your lawyer can't stop us from cutting it," and "we'll talk to your lawyer later."

63. Pendarvis' was arrested, handcuffed and transported by KRUTAK to the Dorchester County Detention Center where he was booked.

64. While Pendarvis was being transported to the detention center, the on-scene Defendants proceeded to completely destroy his Dorchester County hemp crop by bushhogging Pendarvis' fields with SC Forestry equipment. Plaintiff is informed and believes ONEAL, NEALE, WELLS and GWOOD personally took part in the destruction of his hemp crop, physically taking possession of and destroying hemp plants.

65. Pendarvis is informed and believes that FORESTRY agents/employees SCRUBBS and EADDY personally assisted with the destruction of his hemp crop, using FORESTRY equipment (tractors and bush hogs) to mow down his hemp crop.

66. Before taking and destroying Pendarvis' hemp crop without providing him due process, the on-scene Defendants made videos and selfies to memorialize their "crime-fighting" work. Specifically, ONEAL was video recorded chopping-up plants by another SLED Defendant on-scene and STOKES took selfies.

67. On September 20, 2019, both KEEL and WEATHERS publicized written statements to the media "FOR IMMEDIATE RELEASE" on Pendarvis' arrest, identifying Pendarvis by name. In DAG's statement, MOORE stated "the decision to take action – and what action to take – lies with law enforcement," leaving out the active role DAG took in helping SLED with the seizure and forfeiture enforcement.

68. Via correspondence dated November 4, 2019, WHITSETT responded to Pendarvis' counsel's September 20, 2019, evidence preservation correspondence, acknowledging receipt and producing "all non-exempt public records in SLED's possession that are responsive to your request at this time."

69. Via correspondence dated January 22, 2020, the First Circuit Solicitor's Office produced Rule 5/*Brady* material to Pendarvis' counsel on the criminal case.

70. In neither the response to Pendarvis's counsel above or within the materials SLED had provided the First Circuit Solicitor's office, did SLED identify and/or produce any AG opinions requested or produced **after** the August 8th AG Op. or any communications with Chief Administrative Judge for the First Circuit.

<strong>Pre-litigation Known Conduct – Marion County Case</strong>

71. On or about September 25, 2019, Pendarvis' counsel became aware that the SLED and DAG Defendants intended to seize and destroy the two acres in Marion Co.

72. On September 26, 2019, Pendarvis' attorneys filed a *Petition for an Ex Parte Temporary Restraining Order, Motion for Preliminary Injunction, and Complaint for Declaratory and Injunctive Relief* in the Marion County Court of Common Pleas (Marion Case, *see* C/A No.: 2019-CP-33-00675).

73. On September 26, 2019, the Hon. William H. Seals, Jr., temporarily restrained and issued a preliminary injunction against SLED and DAG, temporarily restraining and enjoining on a preliminary basis SLED and DAG from entering onto the property "for the purposes of destroying the hemp crop planted thereon."

74. On October 7, 2016, SLED filed *Response in Opposition Ex Parte Temporary Order and Preliminary Injunction and Request to Dissolve Such Order*. SLED devoted an entire page in that filing to allegations that the Marion hemp crop was "too hot" (i.e., had tested above 0.03% delta-9 dry weight). *See* p.6, October 7, 2019, SLED Response, Marion case.

75. Nowhere in their October 7, 2016, filing did SLED mention a) that Pendarvis had never been noticed about any of his hemp being "too hot," or b) that both the HFA and HPA specifically

allow that hemp testing as much as 1.0% "too hot" can be "reconditioned." *See* S.C. Code §46-55-40(A)(1-4) and Sec. XIII(b) of HPA.

76. Pendarvis filed a *Supplemental Memorandum* in the Marion case, arguing he had never been given any notice about any of his crop being "too hot," providing his own lab report showing the Marion crop testing within the statutory THC limits and noting in response to being notified by DAG that Pendarvis was in "willful violation," SLED had requested the Aug. 8th Op. from SCAG, then proceeded to ignore all of the advice provided in that Aug. 8th Op. for the "proper procedure" to utilize in dealing with Pendarvis.

77. On October 8, 2019, the parties in the Marion case appeared before Judge Seals in Horry County for a hearing on the merits regarding the injunctive relief requested by Pendarvis. SLED's trial counsel conceded the "too hot" issue during oral argument and, upon specific questioning by the Court, confirmed the only issue SLED was arguing was the location issue.

78. Later that day, the Court notified the parties via email that the preliminary injunction was being granted and providing instructions to Pendarvis' attorneys to draft a proposed order.

79. On November 8, 2019, the Court e-filed an Order on the Marion case that specifically noted the protection against unconstitutional takings citizens have pursuant to case law, the Federal Due Process clauses (found in the Fifth and Fourteenth Amendments) and Art. I, Sec.22 of the South Carolina Constitution and the requirements under the law for a valid waiver of such.

80. That November 8, 2019, Order specifically discussed the August 8th Op., quoting directly from that Aug. 8th Op. in the order before stating "The Court can find no cogent reason to disregard the reasoning set forth by the South Carolina Attorney General opinion issued at Defendant SLED's request in this matter."

81. On December 9, 2019, through new counsel, SLED filed a *Notice of Appeal*, appealing the November 8, 2019, Order.

82. On April 1, 2020, DAG provided discovery responses in the Marion case. Of note, in response to IROG#12, which asked DAG to "list with specificity all contact/communications between the Defendants about the Plaintiffs and/or their crops in both Marion and Dorchester Counties," DAG identified only a single communication, sending the memorandum for enforcement to SLED "on or about August 5, 2019."

83. Of additional note in DAG's April 1 Marion discovery responses to IROG#13, which asked DAG to list with specificity all contact/communications between you and any third party regarding the Plaintiffs, DAG identified only letters dated August 5, 2019 to SLED and August 21, 2019 to SCAG, then craving reference "to the documents being produced contemporaneously herewith. The actual produced documents did not contain numerous emails between the DAG and SLED Defendants that were later produced in the Dorchester County state case, exemplified by DAG produced documents in the Marion case being 52 pages produced versus 195 pages produced in the Dorchester case. Nor were any communications the DAG Defendants engaged in/were copied on with the SCAG Defendants identified or produced (other than the identification of the letter to SCAG identified in IROG#13 answer above).

84. Of additional note in DAG's April 1 Marion discovery response to IROG#17, which asked DAG to list with specificity "every prosecutor/attorney general, judicial officer, clerk of court and/or other court personnel the Defendants communicated with about seizing and destroying the Plaintiffs' crops in both Dorchester and Marion Counties," identify if the information of the communication was subsequently shared with other parties and if so, identify the other

parties, DAG identified only the letter DAG sent to SCAG dated August 21, 2019, notifying SCAG of Pendarvis' violation.

85. On May 15, 2020, SLED filed their initial brief and designation of matter for the Marion County appeal. At no time in any filing at the trial level, or in any appellate filing, did SLED ever identify or refer to any attorney general opinion other than the August 8, 2019, AG Op., **nor** did SLED ever refer to the USDA-approved state plan which requires many of the exact same due process safeguards Judge Seals' found had been denied Pendarvis in granting the injunction.

86. On July 28, 2020, SLED finally produced discovery responses for the Marion case, 197 days late. In responses WHITSETT participated in answering, SLED did not identify or produce any AG opinion requested, created or amended **after** the August 8th AG Op. and SLED refused to identify or produce anything related to the Dorchester County crop. SLED's IROG#17 answer is an example of SLED's obstructionist conduct in that it claims Pendarvis' attorney "was copied on every communication from the Defendant to any prosecutor or judicial officer related to this matter." That is false. Pendarvis' counsel was not copied on numerous communications between the SLED and SCAG Defendants about the matter, nor on any communications between WHITSETT, NEALE, ONEAL, WELLS and the Hon. Diane S. Goodstein or her law clerk.

87. Via Rule 11 correspondence dated February 18, 2021, Pendarvis notified SLED's counsel of deficiencies in SLED's discovery responses in the Marion case.

88. On March 12, 2021, having received no response from SLED or their attorney regarding their deficient discovery responses, Pendarvis filed a *Motion to Compel  Discovery Responses from SLED* on the Marion case.

89. In the March 12, 2021 Marion County motion to compel, Pendarvis specifically argued that if SLED was involved in communications regarding the seizure of Pendarvis' hemp crop in Dorchester and was told by a judicial officer, other agency and/or internally that a hearing would be necessary, those communications would be relevant/material to the Marion Co. case.

90. In that Marion County motion to compel, Pendarvis specifically noticed SLED that despite their interrogatory answers having stated "there are numerous emails and memorandum from the Attorney General as well as the Department of Agriculture" and "communications with the Attorney General's Office included opinions from the Attorney General. This includes emails between Adam Whitsett and David Jones," no such communications had been produced, that "if there are communications that involved other parties/agencies, those need to be produced" and any claims of privilege needed to actually comply with the requirements of Rule 26(b)(5)(A) SCRCP to clearly identify what was being withheld.

91. On March 10, 2022, less than two (2) hours before a hearing on Pendarvis' Marion County motion to compel was to be heard, SLED/KEEL's attorney contacted Pendarvis' counsel by telephone, asking if the hearing was necessary since they had subsequently produced "everything" in the Dorchester County case. Pendarvis' counsel noted that KEEL had not produced everything, as there had been specific discovery identified, yet not produced in either case despite multiple notices. KEEL subsequently produced 79-pages of missing discovery.

**Dorchester County State Civil Case**

92. On August 23, 2021, Pendarvis filed a civil complaint in the Dorchester County Court of Common Pleas, C/A No.: 2021-CP-18-01486 (hereinafter "Dorchester case"). That complaint was filed against KNIGHT, KEEL and WEATHERS in their official capacities and John Doe(s), asserting causes of action for False/unlawful arrest/imprisonment and assault and

battery against KEEL in his official capacity and outrage, abuse of process, defamation/defamation per se, negligence/gross negligence/recklessness and conversion against all defendants.

93. Pendarvis served the Dorchester complaint along with discovery requests upon the defendants. In addition to interrogatories and requests for production, Pendarvis served KEEL with two (2) requests for admission (RFAs) pursuant to Rule 36 SCRCP. RFA#1: "Admit that SLED sought judicial approval to destroy Plaintiff's hemp crop; RFA#2: "Admit that judicial approval of SLED's action was denied."

94. Via email dated October 15, 2021, KEEL's attorney asked for a twenty-one (21) day extension to respond to Plaintiff's written discovery requests. Plaintiff's counsel responded back that same day agreeing to an extension provided "we get full and complete answers" (a condition necessitated by the discovery conduct already being engaged in by SLED in the Marion case and detailed above).

95. The same day that extension was requested, KEEL responded to Pendarvis' request for admissions (RFAs). RFA#1: was "denied as stated," with SLED going into great length about what NEALE had done to obtain the arrest warrant. RFA#2: SLED objected claiming "SLED's action" was "vague and ambiguous," before denying "the request as stated."

96. Via Rule 11 correspondence dated November 9, 2021, Pendarvis notified KEEL that he believed KEEL's responses to RFA#1 and RFA#1 were "bad faith efforts to evade properly responding under the rules," providing specifics for why the responses failed to comply with the South Carolina Rules of Civil Procedure; that his discovery was deficient in that he had failed to produce a Rule 33 verification and that KEEL had failed to produce specifically referenced *BATES STAMPED* pages.

23

97. KEEL refused to cure the deficiencies noticed via Pendarvis' November 9, 2021, Rule 11 letter, but after receiving KEEL's last-minute produced 79-pages of missing discovery in the Marion case and reviewing that missing discovery, Pendarvis sent KEEL another Rule 11 letter on March 14, 2022.

98. The March 14, 2022, Rule 11 letter specifically noticed KEEL that the newly produced missing discovery showed his responses to RFA#1 and RFA#2 were bad faith efforts to evade properly responding under the rules. Specifically, the September 11, 2019 email correspondence between WHITSETT, NEALE, ONEAL, WELLS and Judge Goodstein's law clerk showed KEEL had specifically sought the very judicial approval he had denied seeking, via the submission of an *ex parte* order for seizure and destruction submitted to Judge Goodstein.

99. The proposed order submitted by NEALE and WHITSETT on September 11, 2019, was drafted by WHITSETT and ordered "the destruction of all of the plants at the above-listed property location in any manner and at such time and in such manner deemed appropriate by SLED. **A copy of the July 10, 2019, Attorney General's Opinion on this issue is attached hereto and hereby incorporated herein**."

100.   The inclusion/submission of the July 10th AG opinion is notable in that it is **not** the opinion specifically requested by KEEL for the appropriate procedure in enforcing Pendarvis' alleged willful violation and does not contain the specific warnings by SCAG defendants that "SLED **proceed with the utmost care to fully ensure that the grower and all interested parties receive due process**." That July 10th AG Op. specifically does **not** have the instruction to seek judicial authorization by providing "notice to the grower and an opportunity for them to be heard in a hearing."

101.    Pendarvis is informed and believes the submission of the July 10th AG Op. instead of the August 8th AG Op. was an intentional and willful attempt on the part of KEEL, WHITSETT, NEALE, ONEAL and WELLS to mislead the Court into signing an *ex parte* order authorizing SLED's seizure and destruction of Pendarvis' Dorchester Co. hemp crop in direct contradiction of the "proper procedure" they had sought and obtained specifically for his case via the August 8th AG Op.

102.    When specifically asked to admit this misleading conduct to the Court was intentional, KEEL, through responses verified under oath by WHITSETT, denied and instead blamed Judge Goodstein, claiming "a request was made to Judge Goodstein for a meeting to discuss the situation, and that was declined."

103.    KEEL made similar claims via correspondence to WILSON dated September 23, 2019, when he attempted, post-seizure/destruction, to obtain a "formal" opinion from the SCAG Defendants by claiming that following the issuance of the August 8th Op. "SLED attempted to secure an order of destruction from a circuit court as discussed in the August opinion; however, **the court would not entertain such**. **While no specific reasoning was provided by the court**…" KEEL also claimed he "was not aware of the consent to forfeiture and destruction contained" within the HPA at the time he sought the August 8, 2019 AG Op.

104.    Judge Goodstein did not refuse "to entertain" SLED's attempts to comply with the August 8th AG Op., rather KEEL, WHITSETT, ONEAL, NEALE and WELLS were specifically attempting to **avoid** following the proper procedure of the August 8th AG Op, as evidenced by their refusal to refer to or provide the Aug. 8th AG Op. when submitting their proposed order.

105.    Judge Goodstein, through her law clerk, specifically offered KEEL, WHITSETT, NEALE, ONEAL and WELLS a hearing on the matter.

106.    Rather than accept Judge Goodstein's offer to conduct the actual "proper procedure" proscribed by the August 8th AG Op. he had requested, KEEL, through WHITSETT, refused, stating "we appreciate [Judge Goodstein's] consideration and do not anticipate needing a hearing on this matter at this time."

107.    Pendarvis noticed KEEL via his March 13, 2022, Rule 11 letter that his responses to the RFAs was a bad faith effort to evade properly responding under the rules, as the above-emails show KEEL did seek judicial approval to destroy Pendarvis' hemp crop and that judicial approval of that action was denied and demanded the bad faith responses be amended.

108.    KEEL refused to amend and correct his responses, willfully and intentionally obstructing justice and denying/delaying discovery and due process in the Dorchester County state case.

109.    Despite the ongoing and repeated attempts to deny/delay discovery in the state cases, as that discovery has painstakingly come about, it has established conduct amongst the Defendants to conspire to violate Pendarvis' constitutional rights, deny him civil and criminal protections afforded him by law, take his property unlawfully, deny him of due process and obstruct justice.

110.    After refusing Judge Goodstein's offer to have a hearing and comply with actual advice given by the August 8th AG Op., the SLED defendants conspired with the DAG and SCAG defendants to "amend" the opinion and take Pendarvis' hemp crop in violation of his due process rights.

111.    Soon after Judge Goodstein refused to sign the proposed *ex parte* order without a hearing on September 11, 2019, WELLS and UNDERWOOD began conspiring on how to get around Judge Goodstein's refusal to sign the proposed order and the proper procedure as advised by

the Aug. 8th AG Op., through communications supposedly culminating in "SLED first learning of the [HPA] on September 17, 2019."

112.    Emails withheld and not identified by KEEL at all in the state cases, but subsequently obtained by Pendarvis' via subpoena to the SCAG defendants, show SLED planning to seize and destroy Pendarvis' Dorchester Co. hemp crop the **day before** his arrest. In an email from WELLS to ONEAL, NEALE, WHITSETT and GWOOD on September 18, 2019 at 3:16 p.m., titled "Plan for Destruction of Hemp Field In Dorchester Co.- Trent Pendarvis," WELLS informs ONEAL of the plan WELLS, NEALE, WHITSETT and GWOOD "have in mind to deal with the unlawful hemp farm being operated by [Pendarvis]." NEALE was going to obtain one arrest warrant "tomorrow morning." WELLS had already contacted CALORE to get the availability on when FORESTRY could bring the equipment for destroying the crop and expected to find out later that day. "Once we have a date set for destruction, we will meet at the farm in Harleyville and contact Pendarvis. Pendarvis will then be informed of the arrest warrant and the plans for destruction." WELLS went on to explain the destruction is based on the [HPA], attaching a copy of the HPA and quoting section VIII(a) of the HPA.

113.    CALORE assisted by arranging for SCRUBBS and EADDY to show up with FORESTRY equipment and taking part in the destruction of Pendarvis' crop on September 19, 2019.

114.    On September 19, 2019, WHITSETT emailed COOK, wanting to provide "an update that [KEEL] wants me to discuss," before forwarding COOK the *Plan for Destruction of Hemp Field in Dorchester Co. – Trent Pendarvis* email WELLS had sent the day before, and COOK in turn forwarding that email to JONES at 7:57 a.m.

115.    In furtherance of a scheme/goal to violate Pendarvis' constitutional rights, WHITSETT sent JONES and COOK another email on September 19, 2019, attaching the HPA "with

27

relevant portions highlighted. In addition, be advised that 2 of the 6 samples SLED tested from this illegal field were above the .3 allowable threshold." WHITSETT sent that knowing Pendarvis had never been noticed of any plants testing "too hot," nor was he ever noticed of such prior to his arrest and the destruction of his Dorchester crop on September 19, 2019. Notably, the only SLED drug analysis ever produced in this matter is dated **September 24, 2019** and **was allegedly for the Marion Co. crop**.

116.    In concert with KEEL's wishes relayed through WHITSETT, JONES and COOK "amended" their August 8th AG Op. via an email sent at 10:11 a.m. on September 19, 2019. Claiming to "understand additional facts have come to light since we issued that opinion," agreeing with SLED's "conclusion in the abstract that if there has been a valid consent as you describe, no judicial authorization for seizure upon notice from the Department of Agriculture that it has found hemp grown unlawfully in willful violation of applicable law," claiming "that where a grower has consented to the seizure and destruction of unlawfully-grown hemp, SLED or another appropriate law enforcement authority with jurisdiction may proceed with the destruction upon notification from the [DAG] that it has found cannabis sativa grown in willful violation of applicable law." JONES and COOK did this knowing a circuit court had refused to authorize the seizure and destruction of the hemp crop and knowing KEEL intended to use the "amended" email opinion to do precisely what the circuit court had refused to authorize.

117.    Pendarvis is informed and believes that the issuance of this "amended" emailed opinion was intended by JONES and COOK to provide legal cover for the SLED, DAG and DCSO Defendants to arrest Pendarvis without affording him the specific protections of the HFA allowing those Defendants along with the FORESTRY Defendants to seize/destroy Pendarvis' property' in violation of his due process rights, a course of action in concert with the fact that

agents/equipment were waiting on this email to come through before acting. COOK and JONES conduct in providing this legal cover to the SLED, DAG and DCSO Defendants' unconstitutional acts was so vital, that they got an "attaboy" from WHITSETT that afternoon.

118.    Pendarvis is informed and believes the reason KEEL intentionally failed to identify and produce the September 18, 2019, email, was to hide evidence of how the SCAG, SLED, DAG and FORESTRY Defendants had conspired to violate Pendarvis' constitutional rights in this manner.

119.    Other email communications show the DAG Defendants willfully and intentionally withheld notice from Pendarvis that he was being found in "willful violation" of the HFA at the request of the SLED Defendants, in order to deny Pendarvis any opportunity to be heard in challenging such finding. On August 28, 2019, in an email from UNDERWOOD to WELLS and ONEAL, courtesy copied to TERRY and ELSALAH, UNDERWOOD states "I need some direction as to when I can inform [Pendarvis] that [DAG] has rejected his amendment request and that he is willfully violation the [HPA] and law."

120.    Knowing the SLED Defendants intended to seize and destroy Pendarvis hemp crop with no opportunity for him to be heard and challenge the willful violation finding, the DAG Defendants acted in concert, withholding notice to Pendarvis so as to deny him his right to challenge the planned seizure and destruction of his hemp crop and seek legal remedy to such action. WEATHERS, UNDERWOOD, TERRY and ELSALAH all sat silent knowing they had themselves violated the HFA by **not** submitting a state plan which would have provided Pendarvis due process protections.

121.    UNDERWOOD went so far as to share his "sample email" to Pendarvis with WELLS and ONEAL, courtesy copying TERRY, so that all those defendants knew how/when Pendarvis

was being notified of his "willful violation" and that UNDERWOOD and/or DAG was providing Pendarvis with no notice as to how to challenge that administrative finding nor any opportunity to be heard in challenging that administrative finding.

122.    Pendarvis is informed and believes that the SLED Defendants were aware that the administrative finding of a "willful violation" had **not** been made by an impartial decision maker, rather it had been made by the same DAG Defendants who were acting in concert with the SLED Defendants to help them seize and destroy Pendarvis' hemp crop with Pendarvis being provided no opportunity to challenge that agency decision by DAG.

123.    WEATHERS was specifically copied with the "rejection letter" for Pendarvis' amendment applications via August 28, 2019, email and, thus, was fully aware of the actions and conduct being taken by his agents against Pendarvis and knew at the time he was himself in willful violation of the HFA, having failed to timely create/submit SC's state plan as required by the HFA, and set out the specific rules/regulations that were statutorily required to protect hemp farming program participants like Pendarvis.

124.    The SLED and DAG Defendants were aware that Pendarvis had no knowledge seizure and destruction of his hemp crop was being pursued for the alleged violation, intentionally withholding such information from being provided to Pendarvis as evidenced by emails shared amongst UNDERWOOD, TERRY, ELSALAH, LEACH, GWOOD, WEATHERS, JEFFOCAT, MOORE, ONEAL and WELLS.

125.    DAG Defendants JEFFCOAT and UNDERWOOD worked in concert with the SLED Defendants to violate Pendarvis' constitutional right **after** DAG had found him in willful violation by sending emails to Pendarvis asking him to provide the location of the Marion Co. hemp crop, some such emails being courtesy copied to TERRY and ELSALAH.

126.    UNDERWOOD, LEACH, MOORE and TERRY coordinated DAG's public comments about Pendarvis' arrest and the seizure/destruction of the hemp crop in concert with KEEL's public comments, to hide DAG's active participation in concert with SLED and SCAG to deny Pendarvis his constitutional rights.

127.    The coordinated constitutionally violative conduct continued when Pendarvis filed for the TRO in Marion County as evidenced by emails neither identified nor produced by KEEL in either state case but obtained via subpoena to the SCAG Defendants. Those emails document SCAG Defendants continued attempts to provide the SLED Defendants legal cover for violating Pendarvis' constitutional rights, showing WHITSETT sending correspondence to KEEL via email dated September 26, 2019 to YOUNG and courtesy copying KEEL, with YOUNG then forwarding those communications to WILSON, COOK, SMITH, LYNCH, KIRKLAND and VORBERGER with the statement that "Chief Keele says he really needs our help on this."

128.    SMITH, YOUNG, COOK, WILSON, LYNCH, KIRKLAND and VORBARGER all subsequently communicated about giving KEEL the "help" he really needed.

129.    Emails document that KIRKLAND, VORBERGER and SMITH conferred with WHITSETT over the phone on September 26, 2019, who was supposed to stop by their office to meet with them the next day. None of those communications were ever disclosed by KEEL in either state case, despite discovery requests in both specifically asking for all communications about Pendarvis to be described with specificity:

130.    WHITSETT and TERRY specifically shared Judge Seals' October 8, 2019 email informing the parties he was granting Pendarvis' motion for preliminary injunction with SMITH. Via email dated October 22, 2019, WHITSETT and TERRY told SMITH that the Court's ruling

"effectively ends this case and renders the entire Hemp licensure program meaningless," a statement whose falsity is proven by the fact that the reasons cited by Judge Seals in the order have all been adopted as proper procedure in SC via the USDA-approved state plan.

131. SMITH forwarded that email to COOK on October 22, 2019, quoting from a section of Pendarvis' memo that specifically discussed SLED's obtaining the August 8th AG Op. only to ignore it. That email had an attachment (SLED's "Return to TRO") providing SMITH, COOK and the SCAG Defendants with the arguments SLED had made in response to the TRO, thus notifying them of SLED's failure to disclose any attorney general opinion other than the August 8th AG Op.

132. KEEL and WEATHERS and their agents have repeatedly refused to identify/produce responsive discovery and/or comply with the South Carolina Rules of Civil Procedure in a continued attempt to deny Pendarvis due process, obstruct discovery and hide the conduct in concert between all the Defendants that led to Pendarvis' constitutional injuries.

133. There were no emergent cirsumstances that supported denying Pendarvis notice and an opportunity to be heard at hearing. It was simply the desire of KEEL, ONEAL, WHITSETT, NEALE, WELLS, GWOOD, WEATHERS, TERRY, UNDERWOOD and ELSALAH that Pendarvis be denied his due process rights. Those Defendants then acted in concert with each other and WILSON, COOK and JONES to provide legal justification to achieve that goal.

134. Pendarvis is informed and believes that none of the Defendants were ever provided an order authorizing the seizure and destruction of his hemp crop, yet all of the Defendants stood by and allowed his property to be taken in violation of his due process rights, despite Pendarvis'specific challenges to the legality of doing so.

135.    KEEL, through WHITSETT, specifically told WILSON and the SCAG Defendants that Judge Goodstein had refused to authorize the seizure and destruction of Pendarvis' hemp crop.

136.    When NEALE appeared in front of Dorchester County Magistrate Judge Ryan Templeton to obtain the arrest warrant for Pendarvis, NEALE intentionally refused to inform Judge Templeton that the plan was to seize and destroy Pendarvis' hemp crop **or** that Judge Goodstein had specicially refused to authorize such action.

137.    ONEAL specifically contacted Judge Goodstein's law clerk "to ascertain which judge was the appropriate one in Dorchester County to contact to secure pre-seizure judicial authorization for the seizure of Pendarvis'" hemp crop. Despite having been told Judge Goodstein was the appropriate Judge for such judicial authorization, and knowing that Judge Goodstein had refused to authorize such conduct without having a hearing, ONEAL was the on-scene decision-maker for KEEL on September 19, 2019, seizing and destroying Pendarvis' hemp crop and specifically refusing to allow anyone to let Pendarvis contact his lawyer prior to the destruction of the crop, in spite of Pendarvis' repeated requests for due process on the scene.

138.    The criminal charges against Pendarvis were dismissed on or about August 5, 2022, with the First Circuit Solicitor's Office specifically noting on the General Sessions tracking sheet that there was insufficient evidence to prove Pendarvis' actions were willful.

139.    Neither the SLED or DAG Defendants issued any press release regarding the dismissal of the criminal charges against Pendarvis, in a continued effort to hide their consitutionally violative conduct.

140.    Both the SLED Defendants and the SCAG Defendants have repeatedly claimed that the HFA is unclear and does not adequately explain the enforcement process, with the SCAG Defendants citing as much in their opinions and even going so far to monitor press stories and

respond to media about how unclear the law is, lest they and their opinion(s) be portrayed in a negative light. COOK and YOUNG complained in emails about being denied similar "notice" and "oppoturnity to be heard" when the media reported on Pendarvis' case in a light they felt was unfair to SCAG, yet sat silent while Pendarvis' suffered the same.

141.    One article that led COOK and YOUNG to direct SCAG's spokesperson respond to notably contained KEEL's response that "his agency sought proper legal advice before taking action in every step of the case," neglecting to inform the media and the public how he and his agency ignored the legal advice the SCAG Defendants had provided in their August 8th AG Op., a fact neither COOK nor YOUNG cared disclose. *See* Gregory Yee, *Arrest of SC hemp farmer underscores growing pains for budding industry*, The Post & Courier, October 3, 2019.

142.    Despite the claimed 'murky' nature of the HFA, the South Carolina General Assembly clearly intended to protect South Carolina farmers from the arbitrary actions taken against Pendarvis by specifically directing that the corrective action plans described in S.C. Code §46-55-40 were "the sole remedy" for negligent violations and a licensee with such violations "shall not be subject to any criminal or civil enforcement action." S.C. Code §46-55-40(A)(3).

143.    WEATHERS and the DAG Defendants were aware when Pendarvis was arrested and his hemp crop was destroyed without due process, that WEATHERS had failed to submit a plan within sixty (60) days of the effective date of the Act that adequately including "a procedure to comply with the enforcement outlined in this act." *See* 2019 Act No.14, Section 2(A)(4).

144.    WEATHERS has since submitted a state plan in accordance with S.C. Code §46-55-10 *et seq.* that includes procedures for enforcement requiring notice, an opportunity to be heard and no action by the Commissioner "prior to the holding of an adjudicatory hearing" which "shall

be conducted in accordance with the requirements of the South Carolina Administrative Procedure Act" and further includes a section on how to appeal the findings of such hearings.

145.    Pendarvis is informed and believes that the DAG, SCAG, SLED, DCSO and FORESTRY Defendants all knew such procedures did not exist at the time they conspired with the other Defendants to seize and destroy Pendarvis' hemp crop and/or stood idly by allowing such to happen.

146.    Pendarvis is informed and believes that through their conduct documented above the Defendants recklessly, intentionally and willfully violated his constitutional rights and denied him the specific protections of the HFA, as set forth within the causes of action below.

**FOR A FIRST CAUSE OF ACTION**
**VIOLATION OF FEDERAL CIVIL RIGHTS 42 U.S.C. § 1983**
**(VIOLATION OF DUE PROCESS – 4TH, 8TH AND 14TH AMENDMENTS – FALSE ARREST/IMPRISONMENT AGAINST SLED AND DCSO DEFENDANTS)**

147.    At all times mentioned herein, the SLED and DCSO Defendants were acting under the color or pretense of South Carolina State law, customs, practices, usage, and/or policy. Additionally, during the time period in question, the Defendants were well aware of the Pendarvis' constitutional rights, including his right to due process, to be free from false arrest/imprisonment and to be free from cruel and unusual punishment.

148.    As described above, the SLED and DCSO Defendants obtained and executed an arrest warrant versus Pendarvis for a willful violation of the HFA, through misleading omissions to the magistrate (specifically that the Chief Administrative Judge for the circuit had refused to approve their action), while knowingly and intentionally depriving Pendarvis of the protections afforded him under HFA and S.C. Cnst (specfically the 4th, 5th and 8th amendment protections of Art.I, Sec.22 S.C. Cnst and his statutory right to a corrective action plan being the sole remedy for a negligent violation, pursuant to S.C. Code §46-55-40), without need and in bad

faith. Specifically, but not limited to, NEALE's conduct in personally obtaining the warrant; WELLS, ONEAL, WHITSETT and GWOOD assistance in formulating that plan with NEALE. Then WELLS, NEALE, ONEAL, GWOOD, and HOLDEN's execution of that plan, displaying and deploying force in the execution of the warrant and taking Pendarvis into custody. DIXON, THOMPSON and KRUTAK all assisted the SLED Defedndants in the execution of that plan, displaying and deploying force in the execution of that warrant, taking Pendarvis into custody and transporting him while in custody.

149. As a direct and proximate result of these Defendants' conduct, Pendarvis suffered deprivations of his rights secured by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

150. At all times relevant to this action, these Defendants knew or should have known of the wrongfulness of their conduct and the risk of substantial harm to the Plaintiff.

151. The Plaintiff was harmed and suffered injury in violation of the Plaintiff's constitutional rights through the acts and omissions of these Defendants.

**FOR A SECOND CAUSE OF ACTION**
**VIOLATION OF FEDERAL CIVIL RIGHTS 42 U.S.C. § 1983**
**(VIOLATION OF DUE PROCESS – 4TH, 5th, 8TH AND 14TH AMENDMENTS –**
**UNREASONABLE SEIZURE AND UNLAWFUL TAKING AGAINST SCAG, SLED,**
**DAG AND FORESTRY DEFENDANTS)**

152. At all times mentioned herein, the SCAG, SLED, DAG and FORESTRY Defendants were acting under the color or pretense of South Carolina State law, customs, practices, usage, and/or policy.  Additionally, during the time period in question, the Defendants were well aware of Pendarvis' constitutional rights, including his right to due process, to be free from unreasonable seizures and to be free from cruel and unusual punishment, including unlawful takings.

153.    At all times mentioned hererin, the SCAG, SLED, DAG and FORESTRY Defendants were well aware of Pendarvis' constitutional rights, including his rights to due process and to be free from unlawful seizures and takings.

154.    As described above, the SCAG, SLED, DAG and FORESTRY Defendants seized and destroyed Pendarvis' property without legal basis, without due process, without need and in bad faith, knowingly, willfully and deliberately violating Pendarvis constitutional rights secured by the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution. Specifically, but not limited to, WEATHERS, TERRY, UNDERWOOD, ELSALAH and STOKES all played a part in finding Pendarvis' violation was "willful" and denying him due process in regards to that finding. STOKES then took part with ONEAL, WELLS, GWOOD, NEALE, HOLDEN, DIXSON, THOMPSON, KRUTAK, SCRUBBS and EADDY in actually unlawfully seizing and destroying Pendarvis' hemp crop, with CALORE assisting by approving SCRUBBS and EADDY's involvement, along with authorizing the use of FORESTRY equipment to destroy the crop. UNDERWOOD, WHITSETT, COOK and JONES assisted these Defendants with their unlawful seizing and taking, by providing the last-minute emailed "amended opinion" as legal cover for the unlawful seizing and taking of Pendarvis hemp crop, at the urging of KEEL.

155.    As a direct and proximate result of these Defendants' conduct, Pendarvis suffered deprivations of his rights secured by the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

156.    At all times relevant to this action, these Defendants knew or should have known of the wrongfulness of their conduct and the risk of substantial harm to the Plaintiff.

157.    The Plaintiff was harmed and suffered injury in violation of the Plaintiff's constitutional rights through the acts and omissions of these defendants.

**FOR A THIRD CAUSE OF ACTION**
**VIOLATION OF FEDERAL CIVIL RIGHTS 42 U.S.C. § 1983**
**(VIOLATION OF DUE PROCESS – 4TH, 5th, 8TH AND 14TH AMENDMENTS –**
**MALICIOUS PROSECUTION AGAINST SLED AND DAG DEFENDANTS)**

158.    At all times mentioned herein, the SLED and DAG Defendants, acting under the color or pretense of South Carolina State law, customs, practices, usage, and/or policy, instituted the criminal prosecution against Pendarvis and pushed for their continued prosecution while knowing that Pendarvis had been deprived of the protections afforded him under the HFA and S.C. Constitution (specficially his statutory right to a corrective action plan being the sole remedy for a negligent violation, pursuant to S.C. Code §46-55-40 and his constitutional rights protected under Art. I, §22 of the South Carolina Constitution to challenge DAG's finding), without need and in bad faith. Specifically, but not limtied to, WEATHERS, TERRY, UNDERWOOD, LEACH, AWOOD, STOKES and MOORE all knew that DAG had not provided Pendarvis his constitutionally protected right to challenge DAG's decision, had not submitted a state plan to set out the rules/regulations to protect farmers like Pendarvis as required by the HFA and that SLED was attempting to justify the criminal prosecution against Pendarvis citing alleged violations DAG had never noticed Pendarvis about (THC levels). Despite that knowledge, all of those DAG Defendants, supported the criminal prosecution of Pendarvis, seeking updates about the status of criminal enforcement; coordinating DAG's willful violation notification to Pendarvis with SLED; with UNDERWOOD, TERRY, ELSALAH, and JEFFCOAT attempting to assist SLED in gathering evidence to use to criminally prosecute Pendarvis.

159.    KEEL, WHITSETT, ONEAL, WELLS, GWOOD and NEALE all took part in instituting the criminal prosecution against Pendarvis, through their actions described above.

160.    Both the SLED and DAG Defendants attempted to further their desired criminal prosecution of Pendarvis by knowingly and intentionally withholding relevant and/or reasonably calculated to lead to admissible evidence, as described above, that once obtained through other means, successfully helped get the criminal charges dismissed. Plaintiff is informed and believes such conduct would have specifically included KEEL, WEATHERS, WHITSETT, TERRY and UNDERWOOD.

161.    Pendarvis is informed and believes that KEEL, WHITSETT, ONEAL and NEALE specifically opposed the dismissal of the criminal charges, pushing for his continued criminal prosecution.

162.    The criminal charges against Pendarvis were ended in his favor, being dismissed by the First Circuit Solicitor's Office upon a specific finding there was not enough evidence to support that Pendarvis had acted willfully.

163.    That there was no probable cause to institute the criminal proceedings against him. Specifically, had Pendarvis been provided the statutory protections he was entitled to under the HFA, the sole remedy for the alleged violations would have been corrective action plans pursuant to S.C. Code §46-55-40.

164.    That these Defendants acted maliciously, as evidenced through their conduct described in the factual allegations above.

165.    That Pendarvis suffered deprivation of liberty consistent with the concept of seizure as a consequence of the legal proceedings against him.

166.    At all times relevant to this action, these Defendants knew or should have known of the

wrongfulness of their conduct and the risk of substantial harm to the Plaintiff.

167.    The Plaintiff was harmed and suffered injury in violation of the Plaintiff's constitutional

rights through the acts and omissions of these defendants.

**FOR A FOURTH CAUSE OF ACTION**
**VIOLATION OF FEDERAL CIVIL RIGHTS 42 U.S.C. § 1983**
**(VIOLATION OF DUE PROCESS – 4TH, 5th, 8TH AND 14TH AMENDMENTS ON A**
**THEORY OF BYSTANDER LIABILITY FOR FAILURE TO PROTECT THE**
**PLAINTIFF FROM FALSE ARREST, MALICIOUS PROSECUTION and UNLAWFUL**
**SEIZURE AND TAKINGS AGAINST SCAG, SLED, DAG, DCSO and FORESTRY**
**DEFENDANTS)**

168.    The Plaintiff was harmed and suffered injury in violation of the Plaintiff's constitutional

rights through the acts and omissions of the SCAG, SLED, DAG, DCSO and FORESTRY

Defendants for false arrest, malicious prosecution, unlawful seizure and takings as described

above, who were at all times acting under the color or pretense of South Carolina State law,

customs, practices, usage and/or policy.

169.    That COOK, JONES, KEEL, WHITSETT, ONEAL, WELLS, GWOOD, NEALE,

HOLDEN, WEATHERS, TERRY, UNDERWOOD, LEACH, AWOOD, STOKES,

ELSALAH, MOORE, DIXSON, THOMPSON, KRUTAK, CALORE, SCRUBBS and

EADDY knew or should have known that the basis for Pendarvis' arrest and/or the

seizure/taking of his hemp crop and/or criminal prosecution violated Pendarvis' constitutional

rights, they all had opportunity to prevent Pendarvis' such conduct and/or directly participated

in and/or condoned such conduct knowing it was illegal and violated Pendarvis' constitutional

rights.

170.    That WILSON, YOUNG, SMITH, LYNCH, KITTLE, KIRKLAND, VORBERGER and

KNIGHT knew or should have known that the continued criminal prosecution of Pendarvis for

criminal charges that should never have been brought and the attempts to unlawfully seize and take Pendarvis property, in light of the total deprivation of due process rights to Pendarvis regarding his alleged violation of the HFA, violated Pendarvis' constitutional rights, they all had opportunity to prevent the continued criminal prosecution and/or unlawful seizure/taking and/or directly participated in sustaining the criminal prosecution and/or unlawful seizure/taking and/or condoned it.

171.    At all times relevant to this action, these Defendants knew or should have known of the wrongfulness of their conduct and the risk of substantial harm to the Plaintiff.

172.    The Plaintiff was harmed and suffered injury in violation of the Plaintiff's constitutional rights through the acts and omissions of these defendants.

**FOR A FIFTH CAUSE OF ACTION**
**VIOLATION OF FEDERAL CIVIL RIGHTS 42 U.S.C. § 1983**
**(VIOLATION OF DUE PROCESS – 4TH, 5th, 8TH AND 14TH AMENDMENTS ON A THEORY OF SUPERVISOR LIABILITY AGAINST SCAG, SLED, DAG, DCSO and FORESTRY SUPERVISORY DEFENDANTS)**

173.    The Plaintiff was harmed and suffered injury in violation of the Plaintiff's constitutional rights through the acts and omissions of SCAG, SLED, DAG, DCSO and FORESTRY'S supervisory defendants.

174.    Based upon all of the factual and legal allegations made above, those Defendants with supervisory responsibility are liable for the constitutional violations suffered by the Plaintiff. Those Defendants would be WILSON, YOUNG, COOK, SMITH, KITTLE, LYNCH, KEEL, WHITSETT, ONEAL, WELLS, GWOOD, WEATHERS, TERRY, UNDERWOOD, LEACH, AWOOD, STOKES, ELSALAH, JEFFCOAT, MOORE, KNIGHT, DIXSON, THOMPSON and CALORE, who were at all times acting under the color or pretense of South Carolina State law, customs, practices, usage and/or policy.

175.    These Defendants had actual and/or constructive knowledge of a risk of constitutional

injury to the Plaintiff, were deliberately indifferent to that risk and their inaction affirmatively

led to the constitutional injuries suffered by the Plaintiff. Specifically, all these Defendants had

subordinates who actually violated the Plaintiff's constitutional rights, they all failed to

adequately train and/or supervise their subordinates to the rights of persons in similar situations

to the Plaintiff, and those failures to train/supervise caused the subordinates to violate the

Plaintiff's rights.

176.    At all times relevant to this action, these Defendants knew or should have known of the

wrongfulness of their conduct and the risk of substantial harm to the Plaintiff.

177.    The Plaintiff was harmed and suffered injury in violation of the Plaintiff's constitutional

rights through the acts and omissions of these supervisory defendants.

**FOR A SIXTH CAUSE OF ACTION**
**VIOLATION OF FEDERAL CIVIL RIGHTS 42 U.S.C. § 1983**
**(CONSPIRACY TO VIOLATE DUE PROCESS RIGHTS – 4TH, 5TH, 6TH, 8TH, AND 14TH**
**AMENDMENTS, OBSTRUCT JUSTICE & DENYING THE PLAINTIFF RIGHTS AND**
**PRIVILEGES AGAINST ALL DEFENDANTS)**

178.    At all times mentioned above, the Defendants were all acting under the color or pretense

of South Carolina State law, customs, practices, usage, and/or policy.

179.    Additionally, during the time period in question, the Defendants were well aware of

Pendarvis' constitutional rights, including his rights to:

        a.   due process of law;

        b.   to be free from unnecessary and unwarranted force;

        c.   to be free from false arrest and/or imprisonment;

        d.   to be free from the deprivation of property without due process of

             law;

e.  to be free from the deprivation of liberty without due process of law; and,

f.  to the fair, efficient and speedy administration of justice through the criminal and civil justice system.

180.    As described through the factual and legal allegations above, the Defendants conducted themselves repeatedly in violation of the Plaintiff's constitutional rights, specifically seeking to deny him due process and obstruct justice.

181.    As a direct and proximate result of the Defendants acts and omissions, the Plaintiff suffered deprivations of his rights secured by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

182.    At all times relevant to this action, the Defendants knew or should have known of the wrongfulness of their conduct and the risk of substantial harm to the Plaintiff, but they repeatedly violated the Plaintiff's constitutional rights despite that knowledge.

183.    That the Defendants had notice and knowledge that the Plaintiff was being denied his due process rights prior to the instigation of the State cases by the Plaintiff.

184.    That despite having the notice and knowledge that the Plaintiff's constitutional rights were being violated prior to the instigation of the State cases, the Defendants conspired to impede, hinder, obstruct and/or defeat the due course of justice with the intent to deny the Plaintiff the equal protection of the law. Specifically, but not limited to, those Defendants conspired to deny facts they know to be true to shield themselves and others from civil liability for the violation of the Plaintiff's civil rights.

185.    Plaintiff was harmed and suffered injury because of the Defendants violation of the Plaintiff's constitutional rights and that harm has been exacerbated by the conduct of the

Defendants in conpiring to impede, hinder, obstruct and/or defeat the due course of justice with the intent to deny the Plaintiff the equal protection of the law.

## PRAYER

WHEREFORE, Plaintiff prays that the Court entered judgment against the Defendants and award him:

i.    Actual and consequential damages to compensate the Plaintiff for his out-of-pocket expenses, pain, suffering, mental anguish, humiliation, and the indignity he has suffered because of the Defendants' conduct and the violation of his civil rights;

ii.    Punitive damages;

iii.    Attorneys' fees and costs recoverable under 42 U.S.C. § 1988; and

iv.    Such further relief as is allowed by law and that the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

The Plaintiff, John Trenton Pendarvis, hereby demands a trial by jury on all claims.

Respectfully submitted by:

**WUKELA LAW FIRM**

s/Patrick J. McLaughlin
Patrick J. McLaughlin (Fed. ID No. 9665)
PO Box 13057
Florence, SC 29504-3057
T: (843) 669-5634
F: (843) 669-5150
patrick@wukelalaw.com
-and-
**WILLIAMS & WILLIAMS**
C. Bradley Hutto (Fed. ID. No. 2024)
P.O. Box 1084
Orangeburg, SC 29116
T:  (803)534-5218
F:  (803)536-6298
cbhutto@williamsattys.com
**ATTORNEYS FOR PLAINTIFF**

Florence, SC
February 24, 2023